IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

FRANKIE HILL,
Individually, as Representative of Estate of
CW4 Lance Hill, and as Natural Guardian
of DANIELLE L. HILL, a minor,

        Plaintiff,

vs.                                     Case No. 03-1105-JTM

RAYTHEON AIRCRAFT COMPANY,
a subsidiary of Raytheon Aircraft
Holdings, Inc., a foreign corporation,

        Defendant.

MEMORANDUM AND ORDER

This action arises out of a March 26, 2001 training accident in Nuremberg, Germany while plaintiff's decedent was flying an Army RC12K aircraft, identified by Beech serial number FE8 and Army serial number 8550154. Defendant RAC (formerly Beech Aircraft Corporation and often referred to as "Beech" herein) was a contractor under a U.S. Army procurement contract for the RC12K. The matter is before the court on the defendant RAC's motion for summary judgment grounded on government contractor immunity. For the reasons stated here, the court will grant the defendant's motion.

**Findings of Fact**

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.

56(c).  In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party.  *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988).  The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt.  *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985).  The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance.  *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs.  Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).  One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Beech has been involved in the development of Army Special Electronic Mission Aircraft ("SEMA") since the late 1960s. These aircraft, of which the RC12K is but one in a continuum of evolution, were created to perform a specific military mission: battlefield electronic signals intelligence gathering and dissemination ("SIGNIT"). A predecessor of the RC12K was the RU21 "Guardrail" series of aircraft developed by the Army and Beech during the 1970s. With increasingly sophisticated technology and greater mission demands, the SEMA "Guardrail" program evolved to a larger, pressurized RC12D.

The RC12D was a highly modified version of the C12D, which had been developed previously by the Army and Beech. Six RC12Ds were further modified in 1984 to the RC12H configuration.

In September 1985, Contract DAAJ0985CA704 for the purchase of nine RC12K aircraft was awarded to Beech by the Army. Under this contract, before final government acceptance of the last RC12K aircraft, Beech had to give the government the FAA-type certificate data sheet and related certification data covering FAA certification of the aircraft up to 16,000 pounds gross weight. Final acceptance was to occur at the time of execution of DD Form 250 "Material Inspection and Receiving Report" by the authorized government representative.

Hill's complaint alleges that RAC was negligent in the design, manufacture, testing, repair and warnings associated with the RC12K. She claims that there were defects in the anti-ice/deicing system and with the icing warning and detection systems. According to Hill, the RC12K's alleged design defect allowed ice to build up on the horizontal tail surface of the airplane at a rate beyond the capability of the RC12K's deicing system. She claims that this resulted in dramatic changes in the airflow over the airplane's horizontal tail surface and reduced or eliminated the lift generated by that tail surface which, in turn, caused loss of control of the aircraft which crashed in Germany. Hill also contends that RAC failed to properly warn the Army that the RC12K airplane was unsafe due to defects and dangerous conditions in the anti-ice/deicing system and in the icing warning and detection systems; that RAC knew or should have known of these alleged problems and had knowledge "greatly superior" to that of the Army; that RAC failed to warn her decedent and other users of the design defects; and that RAC failed to provide all necessary programs, instructions, manuals, warnings, information and recommendations for the proper and safe use of the RC12K aircraft.

The airplane which crashed was manufactured by Beech pursuant to a government contract outlining precise specifications for the design and development of the RC12K, and RAC was

required to follow these specifications. The contract left to Beech the responsibility for designing, creating, and testing an aircraft which met these specifications.

The Procurement Contract for the RC12K is a large document that includes Statements of Work drawn up by the Army and Beech, creating an extensive data package for drawing and test plans, and test procedures. The first page of the Procurement Contract is executed by both the Beech contract person and the Army's contracting officer in St. Louis. The identifying feature is the code A704, which indicates that it is the contract for the RC12K as opposed to another of the RC12 models.

Alden Van Winkle began working as an aeronautical engineer for the Army Aviation Systems Command in 1968. While with the Army, Mr. Van Winkle was an aeronautical engineer who practiced that skill in aerodynamic disciplines. During the course of his work for the Army, Mr. Van Winkle was involved in the acquisition of the RC12 aircraft "all the way through" from beginning to end. (Van Winkle Dep., at 5.)   He was personally involved in the entire line of the RC12 aircraft.

Van Winkle has previously testified concerning the Army's involvement in the RC12K project. In a case styled *Hall v. Raytheon Aircraft*, Case No. 00-798, slip op. (W.D. Mich. May 15, 2002), filed in the United States District Court in the Western District of Michigan, he provided an affidavit which attests to Mr. Van Winkle's knowledge of the "close cooperation" between the Army and Beech in developing the RC12 aircraft program, including "the preparation of Statements of Work, Technical Data Packages, Interface Control documents, contract negotiations, Preliminary and Critical Design Reviews, and Operator's Manual and Technical Manual reviews." (Def. Exh. D at ¶¶ 4–5.)

The RC12K was a later version of an earlier aircraft that the Army already owned, and there was a progression over time from one model to the next. The RC12 aircraft line was substantially modified from commercial designs to meet NSA and Army intelligence gathering requirements. All

modifications were accomplished in close coordination among Beech, the Army and electronic mission systems contractor personnel.

Charles Lee was the Beech project engineer on the RC12G, H, K and N models from approximately 1982 to 1991. As project engineer, it was Lee's responsibility to ensure that the program was staffed with all the different certification engineers necessary to obtain certification of the airplane.

The actual contract requirements for the RC12K came from the United States Army. The Army would produce a Statement of Work describing what work the government wanted done. Then, Beech would develop its own internal statement of work, showing the cost and schedule to accomplish the Army's Statement of Work.

One of the RC12K's predecessors was the RC12D. The D Model aircraft resulted from the Army's desire for a reconnaissance airplane that could carry more equipment and cover more area. The increasing demand of the electronics suite drove the type and size of airplane in the RC12 family. The RC12D, RC12H, RC12K and RC12N were closely related and served the Army's desire for more equipment and more capabilities. They also used more antennas and more equipment than earlier models. The RC12K incorporated changes in gross weight and electronic equipment inside because "the airplane had to change as the mission changed." (Lee Dep. at 37.)

The original "K" contract was for nine airplanes. Their Beech serial numbers were FE1 to FE9.

When dealing with the acquisition of a new model of aircraft where the Army already has an older version, the process of providing specifications to the contractor is different than if the aircraft was being built from scratch. In creating a new model of an already existent military aircraft, the Army negotiates an additional "production contract" that includes the new features it desires. In this case, the Army returned to Beech, the manufacturer, and Beech provided its thoughts on what the Statement of Work should contain. The Army then generated its own Statement of Work

and Beech bid on performing that work. Beech's bid went to negotiations and eventually the Army and Beech entered into a contract for the work.

The purpose of the Statement of Work produced by the Army is to advise Beech about the types of changes the Army wanted to see in the aircraft. "[W]e cover quite a bit of area in that in different details which we expect to be changed. But eventually the Beech Statement of Work and our statement of work will, like I say, marry up." (Van Winkle dep. at 117.)  The Statement of Work is also the way the Army confirms formally to the manufacturer (in this case Beech) that certain of the special provisions on an earlier model (here, a version of the RC12, such as the RC12D) also need to appear on a later model (here, the RC12K).  The additions to the Statement of Work constituted the changes that were going to be made to the new model of the aircraft.

A Statement of Work for the procurement of nine RC12K airplanes was prepared in 1985. Van Winkle was very involved in the contracting and Statements of Work for the RC12 lineage on behalf of the Army.

The RC12K model specification was prepared by Beech and approved by the Army. The configuration was to be physically and functionally identical to the RC12D, an earlier version of the aircraft. Significant modifications would be made in outer wing panel attachments, landing gear, avionics, engines, and propellers.

The Statement of Work was drafted with reference to several military specifications. As with the development of the predecessor aircraft, the Army and Beech worked very closely together during the design, production and testing of the RC12K.  The Army participated with Beech in at least one formal review per month and weekly or daily telephone conversations with Beech. Van Winkle described the level of communication between the Army and Beech as "robust." (Van Winkle dep. at 47-48.) The Army and Beech participated in airworthiness reviews and critical design review meetings, among other types of meetings. Minutes were routinely taken at these meetings.

The Minutes of the Critical Design Review meeting reflect that both Beech and the Army were assigned several "action items." (Def. Exh. M, at RAC06988.) Indeed, as the development of

the RC12K progressed, there were further substantial modifications made to the contract specifications. Van Winkle estimates that there were 15 formal meetings per year among Beech and federal government representatives (including AVSCOM, CECOM and mission systems contractors) during the years the several RC12 models were being developed.

These types of meetings are required as part of the contract to produce the aircraft. In addition, other informal meetings occur as necessary. Informal communication was also accomplished via facsimile between the Army and Beech. If these were not matters changing the contract per se, the parties would simply exchange information in this manner. The Army also participated in meetings regarding the aircraft survivability equipment installation on the RC12K.

Commonly, when the Army sets out specifications in a contract to purchase an airplane, the Army requires as one of the specifications that the airplane be FAA-certified. This is because the FAA specifications already exist, and the Army is satisfied that those specifications produce a good airplane. These specifications appear within the Federal Aviation Regulations, which are found throughout Title 14 of the Code of Federal Regulations. There is no point in creating a whole new set of specifications for the basic airplane.

The contract for the RC12K required that the aircraft be FAA-certified and meet "Part 23" requirements regarding icing. Part 23 refers to 14 C.F.R. § 23.1419, laying out ice protection criteria in general and requiring compliance with Appendix C to Part 25 of the same chapter. Proof of FAA certification was one of the Army's specifications for the RC12K.

The FAA uses the term "certification," which means that if an aircraft is certified, the FAA is agreeing that there is a minimum level of flight safety, as established by the Federal Aviation Regulations. Civilian or military manufacturers subject to FAA certification requirements must provide testing information proving to the FAA that the product is safe.

The term "qualification," on the other hand, is a military term concerned with both the safety of the aircraft and the ability to accomplish the mission. "[W]hen we say an aircraft is qualified, we

7

mean that it is safe to fly and that it can do the mission that it's being qualified to do." (Hanks dep. at 23-24).

FAA certification was achieved, which included meeting precise federal regulations on icing.

For the RC12K, the qualification requirements included Army test flight activity, testing of the airplane in addition to Beech's tests, and provision of other data requested by the Army.

The new or modified features of the RC12K would be subject to individual specifications and development plans, depending upon what the Army wanted the aircraft to accomplish. With respect to deicing, the Army would have instructed Beech to meet FAA regulations or to meet a particular military specification in place of the FAA regulation, if the Army decided to use a military specification instead. In this case, the Army adopted the Federal Aviation Regulations' standards regarding icing.

According to Lee, the Army instructs the contractor regarding what particular requirement it wants the aircraft to achieve; the contractor comes up with the specific solution to meet the requirement; and the Army then approves the contractor's solution and work.

The warnings contained in the RC12K Operator's Manual conformed to the warnings approved by the federal government.

The Army understood that the addition of antennas, pods and weight involved a tradeoff between mission capabilities and potential degradation of the flight characteristics of the RC12K, and the final configuration was developed, tested and approved by the Army with full knowledge of these tradeoffs.

The Army developed the Aircrew Training Manual for the RC12K without any assistance from Beech.

Beech, as the contractor, would not be paid until an Authorization for Payment for work done by the contractor (called a DD 250) was executed by an Army representative. This official document confirmed that the component which was being paid for had been satisfactorily completed.

Testing of the RC12K was also conducted by both the Army and Beech. First, Beech was required to perform testing and provide the Army data. Then, the Army separately performed its own testing to verify Beech's data. Thus, the Army not only approved the flight characteristics of the RC12K, but it also extensively tested, used, and accepted the RC12K. The Army inspected, approved, and accepted the Subject Aircraft for payment.

Army test pilot Jake Howard testified that the Army's testing went beyond what Beech testing could do in some areas of the aircraft, especially with respect to icing.

When asked whether the Army was as knowledgeable as anyone with respect to the aircraft's performance characteristics after completion of the natural icing testing and stability and control testing, Army test pilot Howard provided uncontroverted testimony to the affirmative. The Army attempted to expose the aircraft to as much testing as possible.

The contract provided for a Beech test pilot to fly with the Army pilots for a one-week period during the natural icing test. This was, in part, because Beech wanted to stay involved in the Army's testing project so that Beech pilots could speak from experience if they had to address something the Army test pilots found.

William Varva is an RAC pilot whose first exposure to the RC series of aircraft was in late 1982 or early 1983, when he was a flight test engineer at Beech. He was a test pilot on the RC12K and the RC12N. Varva participated in natural icing tests on the RC12K conducted by the Army in Duluth, Minnesota in 1992. The aircraft used for these 1992 icing tests was identified by Beech serial number FE3 and was one of the original nine RC12Ks produced under the procurement contract. By that time, the FE3 was configured as an "N" instead of a "K" but the results of the icing tests applied to the "K" because the Army and the Airworthiness Authority gave "credit" to the "K." (Van Winkle dep. at 48; Hanks dep. at 60, 154.)

Beech was contracted by the Army to have a flight test individual present for at least a portion of the Army's natural icing testing in Duluth. The Army returned to Duluth in 1993 for additional series of in-flight icing tests on the RC12K. Varva testified that "the Army wanted to put

9

the RC12K with the mission antenna configuration into a natural icing environment. They recognized that the aircraft was FAA certified for icing as a part of our FAA cert. They wanted to do their own evaluation for whatever reason." (Varva dep. at 31-32.)

At the completion of the test work, Mr. Varva participated in a conference with the Army where Beech helped the Army develop the Operator's Manual for the particular RC12 configured aircraft. Although he could not recall the contents of any specific meetings, Varva testified that the Army and Beech conducted a series of manual review meetings each time a new model of the aircraft was designated. Minutes of these manual review meetings were kept. The minutes reflect what the wording was going to be in the Operator's Manual once the Army and Beech reached an agreement as to particular items. After completion of the manual review, the Army then took over the initial Operator's Manual, and Beech had no more input into the Operator's Manual from that time forward. Varva testified that: "The Army was free to change that manual to add any wording, any limitations, changes, performance changes, anything they wanted to because it was their manual." (Id. at 88).

Indeed, to Mr. Varva's knowledge, Beech was not even given the opportunity to comment on section 533A, a change in the manual relating to severe icing. The Army did not present the information in section 533A to Beech for review or approval. Thus, there would have been no technical review, flight substantiation, or Beech analysis of the language in section 533A concerning severe icing.

The Army test team had more icing test experience than the project manager, Beech, or anybody at the Army's Airworthiness Authority. Lynn Hanks is the Chief Examiner Test Pilot for the Army at its aviation technical test center at Ft. Rucker, Alabama. Hanks was an experimental test pilot who tested aircraft that were being considered for purchase by the military and also tested aircraft that had already been acquired. He was involved in the process of acceptance testing of the RC12K. Hanks testified that his group was the "most knowledgeable people around" on the

RC12N's icing performance. (Hanks dep. at 137-38). (Ex. O, Hanks Depo., at 8:18 – 9:3; 10:24 – 11:8.)

The process of approving an aircraft involves much more than simply one flight test. There are "bench tests," "shake and bake," "vibration tests," and temperature and humidity tests. All of these tests provide qualification engineering data that is considered together when determining the airworthiness of the aircraft.

The mission of the organization Hanks worked for within the Army (at that time, called the "Flight Test Directorate") is to provide engineering flight test services – including planning, execution, and reporting on airworthiness and performance – for any aircraft the Army expects to add to its inventory or change in its inventory. The reports from the Flight Test Directorate were funneled to the Army's Airworthiness Authority. The mission of the Airworthiness Authority is equivalent to the FAA's mission with respect to civilian aircraft.

The Airworthiness Authority is the body tasked with making decisions regarding potential tradeoffs between the safety and mission requirements of government aircraft. The Airworthiness Authority is an autonomous group that is not subject to outside pressure to reach a conclusion against the best interests of the airworthiness of the Army's aircraft and for the combat soldiers. "[I]f we were going to add a widget to an aircraft, this Airworthiness Authority would have to sign off on it to say that this is airworthy. And they do that from a variety of ways. They use analysis. They use simulation. They use actual flight test results." (Hanks dep. at 12).

The flight tester's information and conclusions are provided to both the Army's Project Manager in charge of a given project and to the Airworthiness Authority. The Army's project manager has a chance to rebut or flesh out the concerns identified by the test pilot. Neither the flight tester, nor the project manager is automatically considered correct. Rather, the Airworthiness Authority receives input from both camps and it makes the decision.

In the case of the RC12Ks, natural icing testing was performed as testing separate from testing the manufacturer was expected to do, or the preliminary airworthiness evaluation the Army

11

performed. The Army flight test activity people provided Van Winkle's group in St. Louis a test plan and at least a boiler plate Statement of Work for conducting icing tests. The Army's St. Louis office provided the aircraft and funding for the natural icing testing. Mr. Van Winkle personally flew on two of the icing test flights. The Army had an absolute interest in ensuring that there was a safe airplane.

The Army's natural icing testing was intended to be independent of testing that Beech, the manufacturer, had performed. The Army test group determined what things should be tested.

Hill does not effectively controvert the foregoing, but stresses that the horizontal stabilizer used on the RC12K is identical to that of the Beech King Air 200 (the underlying civilian model for the RC12K aircraft), while the de-icing boot is the same as the as the Beech King Air 300. Hill further stresses that the procurement contract specifications did not separately set forth or require RAC to adopt the type of horizontal stabilizer or deicing system which it chose for the military airplane, and that these items were never separately discussed in meetings between the Army and RAC. Further, the Army's RC12K tests and Beech's engineers did not focus on the specific dangers of ice-contaminated tail plane stall (ICTS).

There is, however, no evidence that the RC12K is uniquely susceptible to ICTS. There is evidence, however, that the Army independently knew of ICTS.

Hill also states that the Army did not actually test the RC12K in icing conditions, and that the horizontal stabilizer was never separately tested for icing. However, icing tests were performed on an RC12 aircraft, which although then configured as an RC12N was originally an RC12K, and the testing was deemed adequate for certification of the RC12K. The testing did not isolate any particular part of the airplane but looked at the icing resistant airworthiness of the entire aircraft.

However, as noted above, while the contract did not set forth separate icing specifications or set forth how RAC should design the horizontal stabilizer, the contract did require that the RC12K meet federal standards of airworthiness, including standards for icing. The FAA standards

do not set forth specifically how a manufacturer meets the standards, but sets forth performance standards that must be met for compliance.

Hill further stresses that the deicing system of the RC12K was not independently approved by FAA employees, but was instead approved by RAC employees with FAA Delegation Option Authority (DOA). The court finds the matter is not relevant to the issues before the court. The plaintiff submits absolutely no evidence that the DOA employees acted in any way improperly or wrongfully. The delegation authority was granted under standard delegation and certification procedures of the FAA, and there is no basis in the record for reaching any conclusion other than that the RC12K was indeed FAA-certified.

Van Winkle "absolutely" expected the Army's icing tests to be comprehensive in checking out the general icing capabilities of the aircraft. (Van Winkle dep. at 78-79). He testified that he would not expect Beech to "warn" or inform the Army that the civilian aircraft that was the predecessor to the RC12K was the subject of an exchange of information between the FAA and Beech regarding tailplane icing because the FAA gave Beech a "clean bill of health" regarding this issue. (Id. at 101-02.) Mr. Van Winkle testified that the May 22, 1995 correspondence and May 23 memorandum identified in his deposition constitute a "clean bill of health" regarding the civilian predecessor's susceptibility to tailplane icing. (Id. at 102-03).

**Conclusions of Law**

RAC seeks summary judgment on the grounds that it is protected by the government contractor defense recognized by the Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 501 (1988). Hill argues that the contractor defense is not available since the facts of the case do not fall within the discretionary function immunity recognized in *Berkovitz v. United States*, 486 U.S. 531 (1988) since it does not involve (according to Hill) any permissible public police judgment. Hill further argues that the defense is inapplicable, citing *Dorse v. Eagle-Picher Ind.*, 898

F.2d 1487 (11th Cir. 1990), on the grounds the defendant has not demonstrated the existence of a significant conflict between state and federal law.

The court rejects the arguments of the plaintiff, and finds that the contractor defense is applicable here. First, contrary to the suggestion of the plaintiff, *Dorse* does not create some *additional* test to be applied *prior* to the use of the *Boyle* standard. Displacement of state law occurs under *Boyle* so long as the three-prong test of that case is met; the three-prong test is itself the definition of when a significant conflict exists between state and federal law. 487 U.S. at 501. *See also Lewis v. Babcock Industr.*, 985 F.2d 83, 86 (2nd Cir. 1993) *cert. denied*, 509 U.S. 924 (1993).

The court also finds that *Berkovitz*, which involved a claim arising from the actions of a government employee rather than a government contractor, undertaken contrary to existing federal regulations, has little bearing here. *Boyle* was decided after *Berkovitz*, deals specifically with government contractors, and is controlling here.

In *Boyle*, the Court wrote:

> [T]he discretionary function exception to the Federal Tort Claims Act does demonstrate the potential for, and suggest the outlines of, "significant conflict" between federal interest and state law in this area. State law is displaced where judgment against the contractor would threaten a discretionary function of the Government. In sum, state law which imposes liability for design defects in military equipment is displaced where (a) the United States approved reasonably precise specifications; (b) the equipment conformed to those specifications; and (c) the supplier warned the United States about dangers in the use of the equipment known to the supplier but not to the United States.

487 U.S. at 501.

Application of this test to the uncontroverted facts supports a finding that the defense is applicable here. The design of military equipment is "assuredly a discretionary function" since the design process frequently requires the inherently discretionary choice among military, technical, and even social considerations, including recognizing trade-offs between safety and combat effectiveness. *Id.* at 511.

First, the evidence establishes that the Army issued reasonably precise specifications for the RC12K. Although the Army did not set specific and discrete icing or horizontal stabilizer

14

requirements for the aircraft, this is not a prerequisite for the application of discretionary immunity. "The 'reasonably precise' standard is satisfied as long as the specifications address, in reasonable detail, the product design feature alleged to be defective." *Kerstetter v. Pacific Scientific Co.*, 210 F.3d 431, 438 (5th Cir. 2000). This element of the test is met if the government and the contractor engaged in a "continuous back and forth" review process regarding the design in question. *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1154-56 (6th Cir. 1995) ("*Tate I*"). Nor is it a requirement that the government specifications focus explicitly on all features of the product, including that later in question; it is sufficient if the government evaluate and approve the design feature in question. *Kerstetter*, 210 F.3d at 435; *Tate I*, 55 F.3d at 1154-55. *See also In re Air disaster at Ramstein Air Base, Germany*, 81 F.3d 570, 572 (5th Cir. 1996).

Here, there is no question but that the Army required RAC to meet FAA standards of certification, including standards with respect to the aircraft's ability to withstand icing. Whether or not the RC12K has similarities to civilian aircraft, the military product supplied by RAC and which is the focus of this litigation, is in no true sense "off the shelf" as plaintiff suggests. The government here did not merely place an order for some already existing airplane by referencing some identifying characteristic such as a model number. *Boyle*, 487 U.S. at 509. Rather, through a closely collaborative process over several years the Army has contracted for an evolving series of military aircraft tailored to its needs. In this process, the Army has set forth explicit standards which the aircraft had to meet, including standards with respect to the ability to withstand icing conditions.

During this process, the Army was not ignorant of the dangers of icing, but was in fact more knowledgeable than any other party about the results of icing tests than anyone else. In *Kleemann v. McDonnell Douglas Corp.*, 809 F.2d 698, 701 (4th Cir. 1989) the court noted that "it is hard to imagine a matter more uniquely in the province of the military — and one less appropriate to second-guessing by civilian courts — than the development of a high technology, multi-mission aircraft." In *Tozer v. LTV Corp.*, 792 F.2d 403, 405-06 (4th Cir. 1986), the court found that the design of reconnaissance aircraft is a "purely military matter" which involves a weighing of costs

and risks which are "uniquely" military in nature. Here, the Army chose to require that the RC12K meet FAA-certification standards, and these standards set forth reasonably precise standards for the contractor's compliance. The fact that these standards are minimum performance standards does not alter the analysis under *Boyle*.

*Boyle* does not require that the contracting authority issue standards which remove all compliance discretion from the contractor. *See Smith v. Xerox Corp.*, 866 F.2d 135 (5th Cir. 1989) (contractor defense applicable where government set forth environmental specifications for weapon simulator and subsequently reviewed and approved the defendant's design). Here, the Army chose reasonably precise standards for the contractor's performance, and it subsequently tested and approved the aircraft produced by the defendant. And the requirement that the government has issued reasonably precise specifications "does not mean ... that the United States must exercise discretion with regard to the specific feature alleged to be defective." *Lambert v. B.P. Products North America*, No. 04-347-GPM, 2006 WL 924988, at *7 (S.D. Ill. April 6, 2006).

> As *Lambert* court explained:
>
> In *Stout v. Borg-Warner Corp.*, 933 F.2d 331 (5th Cir.1991), the court held that, with regard to the first element under *Boyle*, a contractor need only show governmental approval of the overall design of an allegedly defective product. The plaintiffs in *Stout* had argued that specifications for an air conditioning unit were not reasonably precise because they did not specifically prohibit the contractor from installing a safety device. The Fifth Circuit found that the government's thorough review of the overall specifications constituted appropriate approval of reasonably precise specifications. *See id.* at 336. See also *Carley v. Wheeled Coach*, 991 F.2d 1117, 1125 (3d Cir.1993) ("[T]he government need not deprive the manufacturer of all discretion pertaining to a particular design feature in order for the government contractor defense to apply.").

*Id. See also Yeroshefsky v. Unisys Corp.* 962 F.Supp. 710, 718-19 (D. Md. 1997). Here, after negotiations and design process of many years in which both the Army and Beech were intimately familiar with the Army's requirements, the Army chose the RC12K under a contract which required that the supplier obtain FAA certification, rather than requiring separate specifications of each and every component of the aircraft. To require the Army to essentially reinvent the wheel by going to the time and expense of setting forth separate and detailed specifications for every aspect of an

16

aircraft with which it was already highly familiar would represent a tremendous waste of resources. The court finds that the specifications issued by the Army were reasonably precise and that the first element of the *Boyle* test is met here.

The second prong of *Boyle* is met because the evidence establishes that the Army extensively inspected and then approved and accepted the RC12K as conforming to its specifications. Conversely, there is no evidence in the record that the aircraft delivered by RAC failed to conform to the Army's design specifications or production contracts.

Finally, there is no evidence that RAC failed to warn the government of dangers which it knew of but the government did not. This third prong of *Boyle* applies to dangers for which the contractor has actual knowledge. *Boyle*, 487 U.S. at 512. Here, the plaintiff has not demonstrated that the defendant had unique, actual knowledge of icing or horizontal dangers which it did not share with the government. To the contrary, the evidence establishes that the Army through its more extensive testing actually had superior knowledge regarding the RC12K's icing performance. The Army ultimately chose the performance standards for the RC12K, tested the aircraft extensively, and then accepted the aircraft. The court finds that the third prong of the *Boyle* test is also met, and that the defendant is entitled to the protection of the contractor immunity defense.

The court further holds that the defense is also applicable with respect to plaintiff's claims of failure to warn. This court has previously held that the contractor defense may apply to bar claims asserting a failure to warn of known dangers. *Wisner v. Unisys Corp.*, 917 F. Supp. 1501 (D. Kan. 1996). Here, as noted above, the Army was actually in a superior position with regard to the icing performance of the RC12K. The contractor defense is appropriate here because of the Army's superior knowledge and its independent role in drafting the RC12K operator's manual. The Army rather than RAC was responsible for the warnings actually included in the manual. *See Kerstetter*, 210 F.3d at 438 (contractor defense applicable where government contracting authority used discretion in approving flight operator manual's warnings).

The plaintiff has requested leave to file a surreply to address two matters (the *Daubert* qualifications of her experts, and potential application of K.S.A. 60-3304(a)) raised for the first time in RAC's reply. These matters play no role in the court's opinion and a surreply is accordingly unnecessary.

IT IS ACCORDINGLY ORDERED this 15th day of September, 2006, that the plaintiff's request for a surreply (Dkt. No. 67) is denied; the defendant's Motion for Summary Judgment (Dkt. No. 40) is granted.

s/ J. Thomas Marten

J. THOMAS MARTEN, JUDGE